**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | NO.: 11-CR-574-01 |
| MICHAEL HOMER | : | |

## SENTENCING MEMORANDUM

Michael Homer, by and through his attorneys, Dilworth Paxson LLP, hereby submits this Sentencing Memorandum. Mr. Homer respectfully asks the Court to consider the facts and circumstances discussed in this Sentencing Memorandum in formulating an appropriate sentence.

## I.    INTRODUCTION

Mike Homer's life has been spiraling out of control over the last few years. Chronic and debilitating pain, drug abuse, mental illness, loss of his livelihood, loss of his house, two suicide attempts, and four arrests. It has not been pretty. Yet, Mr. Homer has two things going for him, himself and this Court. Himself because, for the first time ever, Mr. Homer has admitted to himself that his mental illness and his addiction are at the root of his problems and he has committed himself to seek appropriate help (psychiatric, substance abuse and medical). This Court because it has the ability to order the help that Mr. Homer needs.

## II.    SENTENCING POST BOOKER

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court returned judicial discretion to sentencing courts by holding that the provisions of the Sentencing Reform Act of 1984 making the Sentencing Guidelines mandatory were contrary to Constitutional requirements under the Sixth Amendment *Id.* at 756. The Court went on to sever those provisions, thereby

"make[ing] the guidelines effectively advisory." *Id.* at 757. In so doing, the Supreme Court went on to explain that this discretion "requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)(Supp.2004)." *Id.* [1]

The Supreme Court's holding in *Booker* makes clear that the Sentencing Guidelines are only one factor the sentencing court should consider in imposing a reasonable sentence. *See United States v. Vampire Nation*, 451 F.3d 189, 196 (3d Cir. 2006) ("[T]he Guidelines are now only one factor among many which can influence a discretionary sentence."). Further, "[a]lthough a within guidelines range sentence is more likely to be reasonable than one that lies outside the advisory range, a within-guidelines sentence is not necessarily reasonable *per se*. Otherwise...we would come close to restoring the mandatory nature of the guidelines excised in *Booker*." *United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006).

In *United States v. Lofink*, 564 F.3d 232, 237-38 (3d Cir. 2009), the Third Circuit reiterated the three-step process that district courts should follow when sentencing. District courts must (1) continue to calculate a guidelines sentence, (2) formally rule on motions and state whether they are granting a departure and how the departure affects the guidelines calculation, and (3) exercise their discretion by considering relevant § 3553(a) factors in imposing a sentence.

Section 3553(a) requires a sentencing court to consider numerous factors in imposing a sentence. The factors listed in § 3553(a) are not all-inclusive and a court is free to consider

---

[1] "The Court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C.A. §3582 (a).

2

others.[2]  Significantly, the "parsimony" language of § 3553(a) directs sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C.A. § 3553(a).  The factors a court must consider under §3553(a) when imposing a sentence are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [by the Sentencing Guidelines];

(5)    any pertinent policy statement [of the Sentencing Commission];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

---

[2]    *See Booker*, 125 S. Ct. at 760 (citing 18 U.S.C.A. § 3661 directing that "[N]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

The Supreme Court post-*Booker* has consistently made clear that "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, ___ U.S. ____, 129 S. Ct. 890, 892 (Jan. 26, 2009). The touchstone of reasonableness, rather, is whether a sentence reflects a rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *See United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009), citing *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc). On appeal, a court will validate a sentence (not procedurally flawed) outside of the advisory guidelines range imposed for reasons "logical and consistent with the factors set forth in section 3553(a)." *See United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006).

The Third Circuit instructs that "district courts must make sentencing determinations on an individualized basis." *Tomko*, 562 F.3d at 574. District courts are to "exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines." *United States v. Olhovsky*, 562 F.3d 530, 547 (3d Cir. 2009). Furthermore, as the Third Circuit recently observed, "it is not severe punishment that promotes respect for the law, it is appropriate punishment." *Olhovsky*, 562 F.3d at 551.

# III.    APPLICATION OF STATUTORY FACTORS

## A.    Nature of Circumstances of Offense and History and Characteristics of the Offender.

### 1.    Mr. Homer's History and Characteristics

Mr. Homer, the only child of two loving parents, grew up in Lancaster County, Pennsylvania.[3] He lived a fairly normal and unremarkable suburban lifestyle. He was an avid and competitive swimmer as a child, with hopes of one day competing at college or in the Olympics. Mr. Homer's world changed drastically when, at age 15, he required surgery to fix a congenital defect with his kidney. As a result of the surgery, Mr. Homer could no longer swim competitively. He thereafter lost interest in swimming, school and advancement. The upward trajectory of his life leveled off.

It seems odd that surgery at age 15 could have such a profound effect. While the surgery was clearly a seminal event (to this day, Mr. Homer struggles with chronic pain in his abdomen and side resulting from the surgery), the resultant loss of the ability to swim competitively threw Mr. Homer out of equilibrium. Clearly, Mr. Homer used his success in swimming as a way to define himself, and as a shield to ward off anxiety and depression that would mar his post-swimming psyche.

After high school, Mr. Homer worked as a machinist at several firms. In 1987, Mr. Homer was hired by Boeing, a job that not only meant great pay and benefits, but the opportunity to do precision machine work on highly sophisticated weapons systems. Mr. Homer's job at Boeing provided his feeling of self-worth and became his crutch against anxiety and depression.

9848056_1

Years of hard work on the factory floor took its toll on Mr. Homer. His back is a mess. (See, e.g., MRI report attached as Exhibit B [2/10/12 lumbar MRI showing multi level disc dehydration, end plate spur, annular tears at three levels, inflamed nerve roots, and disc herniation]). He also continues to suffer from abdomen pain resulting from his kidney surgery. Mr. Homer has regularly treated with a chiropractor since at least 1999. While the chiropractor has at times provided relief, there are times when Mr. Homer's back pain became so bad that he could not stand or walk and consequently was unable to do his job. Mr. Homer's primary care physician (with whom Mr. Homer began treating in 2007) is not a pain management specialist. He treated Mr. Homer for *inter alia* anxiety disorder. While Mr. Homer regularly told the doctor about his back pain, the doctor did not prescribe pain medications, instead advising the use of over the counter analgesics. Unfortunately, Tylenol is sometimes not enough.

Unable to obtain pain medicine from his primary care physician, Mr. Homer foolishly began buying pills at work. Most recently, in early August 2011, Mr. Homer wrenched his back when working on his motorcycle. He went to the local hospital because he could not stand or walk. He also saw his chiropractor. He did not go to his primary care physician because he knew that the doctor would tell him to take Tylenol. Instead, he bought Oxycontin from a co-worker, which purchases led to his instant arrest.

After his arrest, Mr. Homer began treating with a pain management specialist. That pain management specialist first examined Mr. Homer on October 13, 2011 (within 2 weeks of his arrest). The pain management specialist gave Mr. Homer injections into the tender areas of the spine. He subsequently prescribed Mr. Homer various medications containing oxycodone (*i.e.*,

---

[3]    Mr. Homer's parents, George and Barbara, are unable to attend the sentencing due to poor health. They have provided a letter attached as Exhibit A, in which they ask the Court to sentence Mr. Homer in a way that will help him get better.

Vicodin, Percocet, oxycodone). That, as it turns out, was not a good idea, as Mr. Homer is addicted to opioid pain medication (a fact that Mr. Homer did not admit to the pain management specialist, undersigned counsel or himself). Upon losing his job at Boeing, Mr. Homer's mental state deteriorated rapidly.[4] He began abusing opioids, alcohol and whatever else he could get his hands on. His life crumbled: he got arrested for DUI; he tried to commit suicide; he was twice hospitalized and spent brief stints in inpatient mental hospitals; he was arrested again for assault; he has been in Chester County Prison since July 26th.

It wasn't always such a disaster. Mr. Homer worked at Boeing for 23 years. He steadily rose through the ranks. He was hired as a Milling Operator. Then he became a Sheet Metal Assembler B, then a Sheet Metal Assembler A. In 2009, he was promoted to Inspector – Final Assembly. Mr. Homer was a dedicated worker who took pride in his work.

Over the years, Mr. Homer received numerous awards and commendations, including the following:

| AWARD | DATE | DESCRIPTION | EXHIBIT |
|---|---|---|---|
| Pride @ Boeing | Undated | This award is presented to you in recognition of your outstanding performance and valuable contributions to the V22 Quality Organization. Your skills and effort have contributed immeasurably to our success. | C |
| Pride @ Boeing: Accomplishment Award | 4/27/11 | The V22 Quality Team contributes in achieving a high quality aircraft to our customers. The team is taking the initiative to improve processes that improves overall quality of the V22 Program. | D |
| Boeing Service Award | 1/28/09 | This certificate is presented to Michael G. Homer in appreciation of 20 years of valued service with The Boeing Company | E |

---

[4] Mr. Homer has been suspended without pay since September 29, 2011, the date of his arrest. He will be fired after he is sentenced.

| AWARD | DATE | DESCRIPTION | EXHIBIT |
|---|---|---|---|
| Certificate of Appreciation | April 2005 | Please accept this award in recognition of your hard work and dedication in supporting the CCAD and continuing to maintain a high level of customer satisfaction | F |
| Certificate of Appreciation | April 2005 | This award is presented in recognition of your exceptional performance in regaining both cost and schedule. | G |
| Certificate of Appreciation | December 2004 | This is in recognition of your outstanding job in maintaining master schedule for the POD shops. By your suggestions, determination, and your positive attitude, which is exhibited on a daily basis, you have maintained your cost schedule. | H |
| Boeing Service Award | 1/28/04 | This certificate is presented to Michael G. Homer in appreciation of 15 years of valued service with The Boeing Company | I |
| Certificate of Achievement | January 2002 | Your skills and efforts have contributed immeasurably to the success of this organization. You have earned the respect of your peers and supervisors for the professionalism with which you complete your duties. | J |
| Boeing Service Award | 1/28/99 | This certificate is presented to Michael G. Homer in appreciation of 10 years of valued service with The Boeing Company. | K |
| N.C. Mills Sustained Quality Performance | 1997 | Sustained Quality Performance | L |
| Manufacturing Team of the Year | 1993 | Manufacturing Team of the Year | M |

Mr. Homer also consistently improved himself by *inter alia* obtaining additional training and education including, for example, obtaining an Airframe Certificate from the New Jersey Academy of Aviation Science (Exhibit N) and an additional Certificate of Achievement for Completion of an Airframe-FAA Requirements Course (Exhibit O).

By contrast, over his 23 year career, Mr. Homer was never disciplined, never suspended, never "written up" or otherwise criticized for his work or for his attitude. He served Boeing faithfully.

The Government apparently intends to present testimony that paints a dim view of Mr. Homer's job performance. We are unaware of this evidence and have not yet been provided any discovery related to the testimony. Nevertheless, such evidence would miss the point, as Mr. Homer readily admits to using medications that he obtained while at work. In fact, on many days, the medications were needed so that he could do the job, which entailed long periods of standing and walking on the large production facility floor. Thus, Mr. Homer undoubtedly used these illegal medications while at work.

Mr. Homer is not proud of his actions. Nor is he claiming that he was Boeing's employee of the year. He did do his job, though. And he was regularly recognized for doing it well. If his addictions got the better of him and intruded on his work, he is sorry. He takes some solace in Mr. Jones', the Director of Operations for Boeing Military Aircraft, testimony at the July 23, 2012 hearing, that Boeing was able to track every piece of work that Mr. Homer signed off on as an Inspector-Final Assembly and that no field failures or similar problems with the Chinook or the V-22 Osprey were attributable to Mr. Homer's fault. (N.T., 7/23/2012 at 188-89.) Whatever evidence the Government may produce at sentencing about Mr. Homer's work performance should be considered in conjunction with these facts and circumstances.

2.    The Nature and Circumstances of Mr. Homer's Offense

Mr. Homer attempted to purchase 5 Oxycontin 40mg tablets, for which he paid $200.

This is an unusual crime to be prosecuted by the federal government. A crime it is, however. And Mr. Homer does not wish in any way to minimize the seriousness of the offense,

which has already cost him his livelihood,[5] his retirement savings (which he has depleted since his suspension in September 2011), his house (which is for sale and the only offers to date will not cover the outstanding mortgage), his sanity and his freedom. He, more than anyone, appreciates the seriousness of his offense.

**B.    The Need For the Sentence Imposed To Meet Certain Statutory Objectives**

1.    <u>To reflect the seriousness of the offense, promote respect for the law and provide just punishment</u>

Without a doubt, workplace drug abuse is a serious problem that needs to be dealt with seriously. Mr. Homer has lost his job, his livelihood, his retirement, his home, his mental health and his freedom. These losses robustly "reflect the seriousness of the offense, promote respect for the law and provide just punishment."

2.    <u>To deter criminal conduct</u>

There can be little doubt that Mr. Homer's precipitous fall following his arrest for misdemeanor attempted possession will effectively deter anyone similarly situated from doing the same thing, even before this Court imposes sentence.

3.    <u>To protect the public from further crimes of the defendant</u>

Mr. Homer has been arrested four times since August 2011. Prior to that, his only arrest was thirty-two years ago, for criminal mischief. Mr. Homer's recent arrests all stem from his addiction and mental illness. A sentence that provides Mr. Homer with the means to get sober and healthy will protect the public from further crimes committed by Mr. Homer.

---

[5]    Attached as Exhibit P is a letter dated September 25, 2012, debarring Mr. Homer from any future jobs involving government contracts. Mr. Homer's career with defense contractors is over.

10

4. <u>To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner</u>

The need to formulate a sentence that addresses Mr. Homer's addictions, his mental illness and his medical conditions far outweighs the other sentencing factors. Mr. Homer needs help. He needs time in an inpatient facility that provides treatment for people suffering simultaneously from mental illness and addiction. He needs treatment for his chronic pain, not with opioids, but by a physician who can find an alternative to relief. Mr. Homer is drowning; his sentence should be a lifeline.

The Probation Department contracts with two Pennsylvania inpatient facilities that specialize in "Dual Diagnosis" programs for people, like Mr. Homer, who suffer from both addiction and mental illness. Either of these facilities, White Deer Run or Bowling Green Brandywine, would perfectly meet Mr. Homer's need for "correctional treatment." Mr. Homer could be sentenced to a minimum term at either facility, where he would receive inpatient treatment. He could thereafter be required, as a term of his supervised release (and after he is discharged from inpatient care), to participate in intensive outpatient treatment, which Bowling Green and White Deer Run both also provide.

## IV. KINDS OF SENTENCES AVAILABLE

The Court has at its disposal unfettered sentencing options including incarceration, community confinement, home confinement, supervised release, etc. Given the Court's broad discretion in designing an appropriate sentence, the Court may fashion a combination of some or all of these options to arrive at an appropriate and reasonable sentence.

## V. SENTENCING RANGE ESTABLISHED BY THE SENTENCING COMMISSION

Mr. Homer completely accepted responsibility for his actions in this matter, and he timely agreed to plead guilty, thereby entitling him to a two level reduction for acceptance of

11

responsibility pursuant to U.S.S.G. §3E1.1(a). The Government agreed, and this two level reduction was included as a stipulation in the Plea Agreement. In the PSIR, this stipulation was ignored because of Mr. Homer's two post-initial appearance arrests. *See* PSIR at ¶13.

Mr. Homer's acceptance of responsibility has never waivered, even as his life has come unraveled. Mr. Homer's life since he plead guilty last July has been a non-stop roller coaster ride, all straight down. Mr. Homer has hit rock bottom. His downward spiral resulted from his fragile psychiatric, medical conditions and his addition, not from any lack of remorse or acceptance of responsibility. Indeed, Mr. Homer not only accepts responsibility for his actions, he blames himself so completely that he has thought of and attempted suicide. One can hardly imagine a more sincere act of contrition.

While courts have declined to apply the two level reduction for acceptance of responsibility where a defendant continues in criminal activity post-plea, they have done so when the defendant's continued criminal activity resulted from the defendant's conscious choice to continue committing crimes. Courts do not automatically reject the two-level reduction in all such cases, and there is no reason to do so in this case where Mr. Homer's conduct springs from mental illness and addiction and not from a conscious failure to accept responsibility for his action.

If the two level reduction is applied, Mr. Homer's guideline range is 1 to 7 months (Offense Level 6, Criminal History Category II). If the two level reduction is not applied, Mr. Homer's guideline range is 4-10 months (Offense Level 8, Criminal History Category II). In either case, Mr. Homer is in Zone B. As such, the Court is free to sentence Mr. Homer to any combination of imprisonment, intermittent confinement, community confinement or home detention. U.S.S.G. §5B1.1(a)(2); U.S.S.G. §5C1.1(c)(3) and (e).

If the Court were to conclude that Mr. Homer must serve some portion of his sentence in prison, we ask that it keep two things in mind. First, Mr. Homer will not receive any of the rehabilitative, psychiatric or medical treatment that he sorely requires as a short term federal prisoner. Second, Mr. Homer has been in Chester County Prison for nearly three months. He is "clean," but certainly not sober. He has also dealt with his chronic pain for three months without opioids, which is a good start. He is ready for treatment. Keeping him away from treatment much longer could jeopardize Mr. Homer's ultimate chance of recovery. Thus, we ask that any term of imprisonment be substituted in whole, or in part, by mandatory stay in an inpatient hospital with a dual diagnosis program.

In conclusion, we ask the Court to temper any need to further imprison Mr. Homer with the urgent need for him to obtain appropriate treatment. The Bureau of Prisons contracts with two institutions ideally suited to help Mr. Homer. We ask the Court to get him that help sooner rather than later.

## VI.   NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

The Court has granted §3607 Special Probation to Victor Philip and Andy Duris. It has sentenced Michael Patterson to six months imprisonment and one year supervised release, and George Anthony Torres, III to five months imprisonment and a one year term of supervised release. It appears that the Court has not yet sentenced the other defendants charged with misdemeanor possession (James Swan, William Brian Summers, Jeffrey Lynn Forbes, Thomas Alfred Lees, Vincent Joseph Dempsky).

Mr. Homer initially sought §3607 relief. However, such relief would not address his critical need for inpatient treatment. Thus, Mr. Homer withdraws his request for §3607 relief.

As to the avoidance of unwarranted sentencing disparities, the relatively short term of imprisonment imposed on Mssrs. Torres and Patterson, and that faced by Mr. Homer, likely

13

render any disparity "warranted" by the specific facts and circumstances presented in each case. This factor, therefore, is not particularly weighty.

## VII. <u>NEED TO PROVIDE RESTITUTION TO VICTIMS</u>

Restitution is not an issue in this case. *See* PSIR at ¶75.

## VIII. <u>CONCLUSION</u>

Michael Homer asks for mercy from this Court and seeks a sentence that will empower him to get out of the hole into which he has sunk over the last few years.

Respectfully submitted,

/s/ David M. Laigaie
David M. Laigaie, Esquire
**DILWORTH PAXSON LLP**
1500 Market Street
Suite 3500E
Philadelphia, PA 19102
dlaigaie@dilworthlaw.com
Tel: (215) 575-7000
Counsel for Defendant Michael Homer

Dated: October 16 , 2012

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.:** **11-CR-574-01** |
| **MICHAEL HOMER** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, David M. Laigaie, Esquire, hereby certify that on this 16th day of October, 2012, I caused a true and correct copy of Michael Homer's Sentencing Memorandum, to be served via electronic mail and hand-delivery upon the following:

> Faithe M. Taylor, Esquire
> Ashley K. Lukenheimer, Esquire
> Assistant United States Attorney
> U. S. Department of Justice
> Eastern District of PA
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA 19106-4476
> Fax: (215) 861-8594
> *Attorney for United States of America*
>
> Richard P. Kasarda
> U.S. Probation Office, Allentown
> U.S. Courthouse & Federal Building
> 504 W. Hamilton Street, Suite 1401
> Allentown, PA 18101

> /s/ David M. Laigaie
> ————————————————
> David M. Laigaie, Esquire
> **DILWORTH PAXSON LLP**
>
> *Counsel for Defendant Michael Homer*

Dated: October 16, 2012

# EXHIBIT A

10-11-12

The Honorable Timothy Rice
United States Magistrate Judge
United States District Court for the Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19103

Dear Judge Rice:

We are Michael Homer's parents. You will be sentencing our son on October 18, 2012. We write this letter to assist the Court in determining an appropriate sentence for Michael. We are not able to make it personally to the sentencing because of health issues. George has a severe back spasm and is unable to travel very far by car, so the trip from Lancaster to Philadelphia is out of the question.

Michael is our only child. We love him dearly, but he is in need of help. We have tried over the years to help Michael in a million different ways, but the help he needs cannot come from parents.

We understand that Michael has, for the first time in his life, acknowledged both addiction and mental illness. That is a very hopeful sign, as Michael has in the past strenuously insisted that he was not addicted but that he had chronic back pain. He does have chronic pain, both from his back and from surgery that he underwent as a teenager. But he is also an addict and he needs treatment. His acknowledgement of the need for such treatment is a major step in the right direction.

As to mental illness, we know that Michael has long suffered from anxiety and depression. A physician once indicated that he thought that Michael had bi-polar disorder. We are familiar with this disease, as one of our siblings suffered from it. Michael has never gotten the mental health treatments that he needs. He either denied the need for such treatment altogether or he went to a doctor but failed to participate meaningfully in the therapy. It is significant that Michael now embraces the need for mental health treatment. We believe that it removes the most important impediment to him getting better.

We know that Michael is facing a potential jail term. And, in some ways we are able to sleep better knowing that Michael is in prison. At least we know where he is and that he cannot further harm himself. We know that you will do what is right and just as to any jail time. Whatever you decide as to jail, we ask you to include in your sentence that after prison Michael be required to enter into inpatient drug rehabilitation and that he remain compliant with whatever regimen of care is prescribed to him by that facility. We also ask that you require Michael to be treated by a psychiatrist and to follow the regimen of care prescribed by the psychiatrist. Finally, we ask that Michael be required to be treated by a pain specialist, who can address the causes of his chronic pain without using opioid medications.

We pray that Michael is sincere in wanting to help himself. We also pray that the Court crafts Michael's sentence in a way that maximizes the chance that he is able to do so, including getting him the help and support he needs.

Michael is our son and we love him. We will be here for him and assist him as is possible in his recovery.

We appreciate your consideration and thank you for helping our son.

Sincerely,

*George Homer*
*Barbara Homer* Oct 11, 2012
George and Barbara Homer

# EXHIBIT B

**JENNERSVILLE REGIONAL HOSPITAL**
1015 WEST BALTIMORE PIKE
WEST GROVE , PA 19390

| | | |
|---|---|---|
| Name: **HOMER, MICHAEL** | | Exam: **MRI LUMBR SPINE W** |
| Room: RAD- | DOB: 05/04/1962 | Adm Dr: PIERSON, BRIAN |
| MR#: 94827 | Age: 49 Y | Ord Dr: PIERSON BRIAN D MD |
| Pat#: 3482386 | Sex: M | Transcribed: 02/16/2012 10:07 |
| Req#: 3843091-1 | Ack: 02/14/2012 14 47 | Dictated: 02/16/2012 10 09 |
| Adm Date: 02/14/2012 | Dis Date: 02/14/2012 | |

*** Final ***

STUDY: LUMBAR SPINE MRI

DATE OF EXAM: 2/14/2012, 317 p.m. and 2/16/2012, 8:10 a.m.

CLINICAL INDICATION: Radiating back pain

TECHNIQUE: Multisequence multiplanar imaging of the lumbar spine was performed on a 1.5 Tesla short bore magnet with and without IV contrast, 20 cc Magnevist.

Comparison made to 9/10/2007 MRI and 12/1/2011 MRI. Initial images were obtained at 2/14/2012 patient was as returned to 2/6/2012 for additional images.

FINDINGS:

There is no spondylolisthesis.

There are no fractures or pars defects.

Conus is normal. There is no discitis or osteomyelitis.

There is multilevel disc dehydration. There is an anterior endplate spur L2-L3. There is a posterior annular tear L1-L2, L3-L4, and L4-L5

L1-L2: Increased signal in the right neural foramina is favored to represent an inflamed exiting right L1 nerve root which is difficult to separate from a paracentral/foraminal disc herniation. A nerve sheath tumor is felt far less likely. Clinical correlation advised for right L1 radiculitis. Findings show no significant change compared to 12/1/2011 and are new compared to 2007. As a precaution followup MRI in 6 months maybe obtained to ensure stability.

L2-L3: Mild disc bulge; no stenosis; no change

L3-L4: Bulging disc eccentric laterally towards the left resulting in mild left neural frontal narrowing; no change

L4-L5: Bulging disc resulting in a moderate lateral recess (subarticular stenosis) narrowing; no change

**JENNERSVILLE REGIONAL HOSPITAL**
1015 WEST BALTIMORE PIKE
WEST GROVE , PA 19390

| | | |
|---|---|---|
| Name: **HOMER, MICHAEL** | | Exam: **MRI LUMBR SPINE W** |
| Room: RAD- | DOB: 05/04/1962 | Adm Dr: PIERSON, BRIAN |
| MR#: 94827 | Age: 49 Y | Ord Dr: PIERSON BRIAN D MD |
| Pat#: 3482386 | Sex: M | Transcribed: 02/16/2012 10:07 |
| Req#: 3843091-1 | Ack: 02/14/2012 14 47 | Dictated: 02/16/2012 10:09 |
| Adm Date: 02/14/2012 | Dis Date: 02/14/2012 | |

*** Final ***

L5-S1: Disc osteophyte complex greatest laterally resulting in moderate, right greater than left, neural foraminal narrowing; mild to moderate lateral recess narrowing; no change

CONCLUSION:

Abnormality on the right at L1-L2 probably represents an inflamed nerve root due to accompanying disc herniation. A nerve sheath tumor is felt far less likely. Please see above for additional findings and recommendations.


Thank you for your referral,

Tariq Quraishi, MD

Dictating Physician:
Transcribed by **DICTAPHONE USER, RAD at 02/16/2012 10:07**

**EXHIBIT C**

**BOEING**

# Michael Homer

This award is presented to you in recognition of your outstanding performance and invaluable contributions to the V22 Quality Organization. Your skills and efforts have contributed immeasurably to our success.   Thank you for your dedication.

*Michael Culbert*
*V22 Quality Manager*

# EXHIBIT D



# Congratulations

*You have received the following award!*

**Michael Homer**

Accomplishment Award (50 points)
April 27, 2011

**Nominated by:** Michael Culbert

The V22 Quality Team contributes in achieving a high quality aircraft to our Customers. The team is taking the initiative to improve processes that improves the overall quality of the V22 Program.

You can redeem your award points two ways: (1) through the Pride@Boeing catalog or (2) in person at any Boeing Store location.

- To redeem your award through the Pride@Boeing catalog, log on to Boeing TotalAccess at https://my.boeing.com; from work or MyBoeing Express at https://my. boeing.com/express; from home; enter your BEMS ID and TotalAccess password; click the TotalAccess tab; click "My Pay and Incentives," "Incentives & Employee Recognition," and "Pride@Boeing." Click "Redeem Awards Points" in the Pride@Boeing window to view the catalog and place your order.

- To redeem your award for Boeing Store merchandise, visit one of the Boeing Store locations (http://boeingstore.com/content/Store_Locator.htm;) with your Boeing badge. Award points can be used on a point-per-dollar basis. Some or all of your award points can be used at any one time; remaining points will remain in your account.

Upon deposit of the above-listed award points into your Pride@Boeing account, an Earnings Statement will be generated. You can view the Earnings Statement via TotalAccess or MyBoeing Express. Click "My Pay & Incentives" and then click "Paycheck." This net zero Earnings Statement is produced to provide you with details on the company's investment in making this award, which includes costs for the tax assist. Tax assistance is recorded to offset the taxes paid by Boeing on your behalf. The total of the award plus tax assist is reflected in your annual gross earnings.

The company reserves the right to revise or cancel the Pride@Boeing program at any time without notice.

If you need assistance, contact TotalAccess at 1-866-473-2016 (TTY/TDD service, 1-800-755-6363).

# EXHIBIT E

**BOEING**®

This certificate is presented to

# MICHAEL G. HOMER

in appreciation of

## 20 YEARS

❖

of valued service with The Boeing Company

January 28, 2009

W. James McNerney, Jr.

Chairman, President and Chief Executive Officer



# EXHIBIT F

# Certificate of Appreciation

presented to

## Michael Homer

April 2005

Please accept this award in recognition of your hard work and dedication in supporting CCAD and continuing to maintain a high level of customer satisfaction.

Thank you for a "Job Well Done"!

Joseph A. Toriello
Sr. Manager, Chinook Assembly



Pride@Boeing

# EXHIBIT G

# Certificate of Appreciation

presented to

## Michael Homer

April 2005

This award is presented in recognition of your exceptional performance in regaining both cost and schedule.

_Christopher D. Miller_
Christopher D. Miller
Manager, Chinook Assembly

_Joseph A. Toriello_
Joseph A. Toriello
Sr. Manager, Chinook Assembly

★ Pride@Boeing

# EXHIBIT H

# Certificate of Appreciation

awarded to

## Mike Homer

December 2004

This is in recognition of your outstanding job in maintaining master schedule for the POD shops. By your suggestions, determination, and your positive attitude, which is exhibited on a daily basis, you have maintained your cost schedule.

Wanda J. Bonhage
Manager, Chinook Assembly

Joseph A. Toriello
Manager, Chinook Operations

Pride@Boeing

# EXHIBIT I





*BOEING* ®

This certificate is presented to

**MICHAEL G. HOMER**

in appreciation of

**15 YEARS**

of valued service with The Boeing Company

January 28, 2004

❖

Harry Stonecipher
President and Chief Executive Officer

# EXHIBIT J

Recognizing
Exceptional
Performance

# Pride@ Boeing

## Lot Time and Support Cell Team

### Certificate of Achievement

awarded to

**Mike Homer**

January/2002

Your Skills and efforts have contributed immeasurably to the success of this organization. You have earned the respect of your peers and supervision for the professionalism with which you complete your duties.

We congratulate you and personally thank you for your outstanding performance.

Wanda Bonhage
Manager – Lot Time

Rich Latella
Sr. Manager - Manufacturing

Len Weber
Director - Manufacturing

*BOEING* ®

# EXHIBIT K



BOEING®

This certificate is presented to

MICHAEL G. HOMER

in appreciation of

10 YEARS

of valued service with The Boeing Company

January 28, 1999



Phil Condit
Chairman and Chief Executive Officer

Harry Stonecipher
President and Chief Operating Officer

# EXHIBIT L



**EXHIBIT M**



**QUALITY ◆ PRIDE**

**Manufacturing
Team of the Year**

# Michael Homer
**1993**

Boeing Defense & Space Group

# EXHIBIT N



**New Jersey Academy of Aviation Science**

Millville, New Jersey
Air Agency Certificate No.
AG9T007R

Aviation Maintenance Technician School

*Airframe Certificate*

This is to certify that

*MICHAEL HOMER*

Has satisfactorily completed the
Federal Aviation Administration Approved
General and Airframe Curriculums

Given under our hand this _2nd_ day of _June 2007_
I certify the above statements are true.

Benjamin Merighi
Board President

Darlene Barber
Superintendent

Patrick A. Cruet
Assistant Principal

# EXHIBIT O



# CUMBERLAND COUNTY COLLEGE

## CERTIFICATE OF ACHIEVEMENT

IS PRESENTED TO

# MICHAEL HOMER

FOR COMPLETION OF

## AIRFRAME–FAA REQUIREMENTS

Cumberland county college

_Vickie Simek_
EXECUTIVE DIRECTOR
PROFESSIONAL & COMMUNITY EDUCATION

11/15/2007
DATE

7.5 CEU

This project was funded in part by a grant awarded under the President's Community-based Job Training Grants, as implemented by the U.S. Department of Labor's Employment and Training Administration.

# EXHIBIT P



Office of the Deputy General Counsel

<u>VIA FEDEX</u>

SAF/GCR
1235 S. Clark Street
Suite 301
Arlington, VA 22202

**SEP 2 5 2012**

Mr. Michael Homer
c/o David M. Laigaie, Esq.
1500 Market St
Suite 3500E
Philadelphia, PA 1910-2101

      Re: Notice of Debarment

Mr. Homer:

      Effective this date, the Air Force has debarred you, Michael Homer, from Government contracting and from directly or indirectly receiving the benefits of federal assistance programs. This action is initiated pursuant to Federal Acquisition Regulation (FAR) Subpart 9.4, Defense FAR Supplement 209.4 and Appendix H, and 2 C.F.R. Part 1125. The effects of debarment are set forth in the Notice of Proposed Debarment issued to you, as well as in the aforementioned regulations, which are provided on our website at:
http://www.safgc.hq.af.mil/organizations/gcr1/index.asp.

      On July 25, 2012, the Air Force proposed you for debarment and afforded you the opportunity to submit information and argument in opposition to your proposed debarment. You were issued a Notice of Proposed Debarment and a Memorandum in Support of the Proposed Debarment. You have not responded.

      I have carefully considered all information contained in the Administrative Record and have made the following determinations: a preponderance of the evidence establishes the existence of a cause for debarment; you have failed to demonstrate your present responsibility; and debarment is in the public interest and necessary to protect the Government's interests.

*Freedom Through Air Power*

I have determined that a three-year debarment term is appropriate and commensurate with the seriousness of the cause for debarment. Your debarment is effective immediately and will run from the date of your suspension, September 30, 2011, and, thus, will terminate on September 29, 2014.

Sincerely,

DAVID B. ROBBINS
Acting Deputy General Counsel
(Contractor Responsibility)