# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| v. | : | CRIMINAL NO. 11-574 |
| MICHAEL HOMER | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Since August 2011, the defendant, Michael Homer, has committed and been charged with four separate crimes, all of which put other people's lives in danger: (1) in August 2011, the defendant drove under the influence of Oxycontin, hit a sign, fled the scene of the accident, and was still driving when police pulled him over; (2) in September 2011, the defendant committed the instant crime, which will be described in further detail below and which involved his abuse of prescription drugs while serving as an inspector of the military aircraft being produced by Boeing; (3) in April 2012, the defendant again drove while under the influence, this time of alcohol, and again struck a pole; and (4) in July 2012, the defendant was arrested and charged with simple assault and harassment arising out of a domestic incident in which the defendant admitted that he was involved in an altercation with a woman living with him. In addition, police were dispatched to the defendant's home in February 2012 to address another domestic incident, and in July 2012, an individual who was living in the defendant's home was arrested for committing burglaries.

All but the first of these incidents occurred while the defendant was on bail in the instant case – thus it appears that the only thing that stopped the defendant from committing additional crimes was the fact that he was arrested for the July domestic incident and never released from local custody. Now, facing additional incarceration for his federal crimes, the

defendant, through counsel, claims to be committed to seeking appropriate help. The government is in agreement that the defendant needs help with his substance abuse and psychiatric issues, but his complete disregard for the safety of his fellow citizens and for the opportunity afforded him by this Court to receive any needed medical and psychiatric services and reform his behavior while on pretrial release should not be ignored. Nor should the crime that he committed be understated: he was part of the thin line of final inspectors helping to ensure the quality of the V-22 Osprey and Chinook helicopters actively used by military forces all over the world. A line that was challenged by the rampant drug use and abuse by dozens of Boeing workers who manufactured those helicopters. And yet as he admits, and as testimony at his sentencing by one of his co-workers will show, he abdicated his job duties by regularly getting high at work on illegally purchased prescription pills. The sentencing hearing in this case is the time for this defendant to be held accountable for his conduct, which can be accomplished by a sentence that not only reflects the seriousness of his offense, promotes respect for the law and provides a just punishment for his criminal conduct, but also provides the defendant with treatment opportunities after he has served an appropriate period of incarceration. To accomplish these objectives and the other objectives contained in Title 18, United States Code, Section 3553(a), the government respectfully requests that the Court impose a sentence at the top of the sentencing guideline range, that is, a sentence of 10 months imprisonment, followed by a full term of supervised release.

I.  **BACKGROUND**

On July 10, 2012, the defendant pled guilty to Count One of the information charging him with attempted possession of oxycodone, in violation of Title 21, United States Code, Section 846. The charge stems from his attempt on September 8, 2011, while on Boeing's

Ridley Park campus, to illegally purchase five OxyContin 40mg tablets from an individual cooperating with the government.

## II. SENTENCING CALCULATION

### a. Statutory Maximum Sentence

According to the Probation Office, the Court may impose a sentence of one year imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment.[1]

### b. Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---:|
| Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1: | **8** |
| The Probation Office did not apply a two-level decrease to the defendant's offense level for acceptance of responsibility because of the defendant's post-guilty plea criminal conduct (see further discussion, below) | **0** |
| **TOTAL OFFENSE LEVEL** | **8** |

The defendant has a Criminal History Category of **II** because he committed a DUI prior to the instant offense (although his guilty plea to that offense post-dated the instant offense). PSR ¶¶ 28-29. Accordingly, with a total offense level of 8 and a criminal history category of II, his guidelines range is **four to 10 months imprisonment**.

---

[1] The potential fine of $100,000 per count of conviction is different from the fine that the parties understood could be imposed at the time of the defendant's change of plea hearing – it was the parties understanding that the maximum fine that could be imposed was $1,000 per count of conviction. The special assessment is also different in that it is $25 instead of $100.

**III. DISCUSSION OF ACCEPTANCE OF RESPONSIBILITY**

As the Court is aware, the government and the defendant reached plea agreement in this case, and the defendant pled guilty pursuant to that agreement. In the agreement, "[t]he parties agree[d] and stipulate[d] that, as of the date of th[e] agreement, the defendant ha[d] demonstrated acceptance of responsibility for his offense making the defendant eligible for a two-level downward adjustment under U.S.S.G. § 3E1.1(a)." See Page 4, ¶ 7(b). However, subsequent to the defendant's signing of the plea agreement and guilty plea, the defendant was arrested and charged with simple assault and harassment for offenses alleged to have been committed on July 25, 2012. The government will present evidence at the sentencing hearing that although the defendant denied the extent of the allegations made against him, he admitted to getting into a physical altercation on July 25th with the woman who was living with him. Under these circumstances, it is the government's position that the Probation Office has correctly challenged the propriety of any reduction for acceptance of responsibility, and the government leaves the ultimate decision on its propriety to the discretion of the Court.

**IV. DEFENDANT'S WORK HISTORY**

The defendant began his employment at Boeing in 1987. His employment history is summarized as follows:

> January 1987 to June 2000 – Milling Operator
> June 2000 to October 2002 – Sheet-Metal Assembler B
> October 2002 to May 2009 – Sheet-Metal Assembler B
> June 2009 to Present – Inspector-Final Assembly

This defendant, like every other defendant in this matter, signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company. He also agreed to inform the company if he was arrested or charged with any criminal offenses.

## V. DISCUSSION OF THE SENTENCING FACTORS

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[2] In this case, the government believes that a sentence at the top of the sentencing guideline range is warranted.

---

[2] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

### A. Nature and Circumstances of the Offense and History and Characteristics of the Defendant.

#### I. Oxycodone

"Oxycodone is a semisynthetic opiate manufactured by modifying the chemical thebaine, an organic chemical found in opium.[3] It is the active ingredient in a number of commonly prescribed pain relief medications, including Percocet and OxyContin, that come in a variety of dose strengths.[4] The "[i]ntended use of OxyContin is for long-term relief (up to 12 hours) of moderate to severe pain associated with conditions such as cancer and arthritis."[5] Currently all of the products containing oxycodone are classified by the Drug Enforcement Administration as Schedule II controlled substances.[6]

Oxycodone's chemical structure is similar to codeine and is almost a potent as morphine in its ability to produce opiate-like effects, including euphoria.[7] It works through the central nervous system by altering the user's sense of pain and his or her emotional response to pain, but like other narcotic medications, can impair certain daily activities, including driving and other mental and physical abilities.[8] These side effects – including breathing irregularity or respiratory depression; increased pressure of cerebral and spinal fluid; headaches; nausea; dizziness; seizures; heart failure; and low blood pressure  -- are usually mild, but there are more

---

[3] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

[4] Id.

[5] Id.

[6] Id.

[7] Id.; http://www.teenoverthecounter drugabuse.com/oxycodone.html.

[8] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

serious complications and negative effects from using products containing oxycodone, particularly when abused.[9]

When oxycodone products are used consistent with a doctor's care, signs of addiction can be monitored and controlled more effectively than when used outside of a doctor's care.[10] Accordingly, "when used illicitly, the chances of becoming addicted to it increase exponentially."[11] In part, this is caused by the fact that oxycodone has "many similarities to other drugs of abuse including alcohol, heroin, and marijuana, in that they elevate levels of dopamine, the neurotransmitter linked with pleasure experiences. As a result, prolonged use and abuse of oxycodone medications eventually changes the brain in such a way that a user cannot quit on his or her own, a typical sign of addiction."[12] "Drugs that cause similar effects to oxycodone include: opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine."[13] The potential for withdrawal symptoms when using prescription opioids (e.g., oxycodone) is extremely high, especially when the user stops suddenly, and may include severe symptoms such as anxiety, nausea, insomnia, muscle pain, fevers, and other flu like symptoms.[14]

## II. Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to

---

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[13] http://www.justice.gov/dea/pubs/abuse/drug_data_sheets/Oxycodone.pdf

[14] Id.

cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[15] Prescription drugs hook the poor and the rich, the old and the young, the black and the white.[16] It is an epidemic.[17] Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[18] And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[19]

In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller. While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold misery and harm. The White House drug policy office estimates that such abuse rose seventeen percent from 2001 to 2005. That office reports that currently there are more new abusers of prescription drugs than new users of any illicit drugs. As recently reported, "Young people mistakenly believe prescription drugs are safer

---

[15] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

[16] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[17] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[18] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[19] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

8

> than street drugs . . . but accidental prescription drug deaths are rising and students who abuse pills are more likely to drive fast, binge-drink and engage in other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of prescription drug abuse").

In the Eastern District of Pennsylvania, prescription drug abuse is quite significant as well.[20] Local clinics have stated that "drug addiction in both Philadelphia and New Jersey is almost legendary due to its severity. Heroin and opioid-based prescription medication are two the top drugs abused in these areas. More than four percent of those surveyed in both the Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug dealers."[21] State legislators in Pennsylvania have been trying to address this growing problem.[22]

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[23] The general public – which the Court takes into

---

[20] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis, June 2007, available at http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[21] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[22] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican Communications, May 3, 2004, available at http://www.pasenategop.com/news/archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud and abuse are becoming a serious problem in Pennsylvania and other states, and stricter guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

[23] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse. According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.
- 31 percent say there is "nothing wrong" with prescription drug use.
- 29 percent think prescription painkillers are non-addictive.[24]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[25] This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[26]

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[27] It is a "significant threat" in the United States.[28] Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[29] The investigation here took four years

---

[24] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[25] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[26] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

[27] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[28] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[29] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

> III. **Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society**

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[30]  Here, the defendant reports that his salary at the time of his arrest was $80,000, which puts him in the top quarter of American earners.  And unlike junkies and drug dealers on the street, the defendant had options.  The Boeing Company's medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment. This defendant also was afforded opportunities while on bail to get psychiatric and substance abuse treatment to assist the defendant in addressing any issues that are preventing him from becoming a law-abiding citizen.

Furthermore, what must be considered in determining the appropriate sentence for this defendant is not just the salary, medical benefits and treatment options that the defendant was offered by virtue of his employment, but also the extremely sensitive nature of his work – work he performed while using and abusing opioids.

---

[30] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

11

The Boeing Company Ridley Park facility produces the CH-47 Chinook and portions of the V-22 Osprey. "The Chinook is a multi-mission, heavy-lift transport helicopter. Its primary mission is to move troops, artillery, ammunition, fuel, water, barrier materials, supplies and equipment on the battlefield. Its secondary missions include medical evacuation, disaster relief, search and rescue, aircraft recovery, fire fighting, parachute drops, heavy construction and civil development."[31] Chinooks are currently in use by the U.S. Army, U.S. Army Reserve and National Guard, and International armed forces.[32] It has had wide use in Operation Enduring Freedom in Afghanistan and Operation Iraqi Freedom in Iraq, including use in air assault missions, inserting troops into fire bases and later bringing food, water, and ammunition.[33] It was particularly useful in the mountainous terrain of Afghanistan where high altitudes and temperatures limited the use of the Black Hawk.[34]

The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[35] As a result, "more than

---

[31] http://www.boeing.com/rotorcraft/military/ch47d/.

[32] http://www.boeing.com/rotorcraft/military/ch47d/docs/CH-47D_overview.pdf

[33] http://www.armedforces-int.com/projects/boeing_ch_47_chinook.html

[34] Id.

[35] http://www.boeing.com/rotorcraft/military/v22/

165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force Special Operations Command Osprey squadrons. The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007. The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[36]

The government understands that the defendant worked on the production of the Chinook and the V-22 Osprey as a <u>final</u> inspector. The consequences of any undetected errors made by this defendant during his work cannot be understated. Any errors that affected the performance of completed Chinook or V-22 Osprey could prove disastrous, as experience has shown. For example, in May 2011, the Australian Army grounded its fleet of Chinook helicopters after one of the large troop-carrying aircraft crashed in Afghanistan, killing an army pilot.[37] There is no indication that the cause of the crash had anything to do with substance abuse by employees at Boeing's Ridley Park facility, but the story is illustrative of the exponential effect that a problem with a single Chinook or V-22 Osprey could have on military operations: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet. In fact, the United States military has also grounded its Chinook and V-22 Osprey fleets when accidents have happened. For example, the United States Army grounded its 466 Chinook' troop helicopters in August 1999 and advised other militaries to halt flights worldwide after a crack was found in an engine gear of a British Chinook helicopter; the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after

---

[36] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

[37] http://www.theaustralian.com.au/national-affairs/defence/chinook-fleet-grounded-as-fatal-afghan-crash-investigated/story-e6frg8yo-1226159681671. The cause of the crash may never be known because the flight recorders were destroyed by a missile soon after the accident. http://www.dailytelegraph.com.au/news/cause-of-a-helicopter-crash-in-afghanistan-that-killed-army-pilot-lieutenant-marcus-case-may-never-be-known/story-e6freuy9-1226397995791

discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[38]

### IV. Analysis of the Defendant's Background

As stated above, the defendant began his employment at Boeing in 1987 and, since 2009, has been an Inspector – Final Assembly, whose job it is to:

> Inspect all aircraft in final assembly positions against drawings, engineering orders, compliance to contract change notices, Army material Command Reports, and Unsatisfactory Reports. Inspect all sheet metal subassemblies for conformance to drawings, check fixtures, process sheets, and specifications, for completeness, finish and workmanship.

See P&M Job Description, Attachment A. In other words, the defendant was one of the final arbiters of whether the military helicopters being produced at the Boeing plant were ready and safe to be used by the U.S. military and other militaries in combat and other missions all over the world. As testimony at sentencing will show, he was on drugs when he performed this function, and therefore betrayed the men and women who depended on him to make sure that the helicopters they are flying in are the highest quality machinery our nation can offer them. He also repeatedly put our civilian population in danger by repeatedly driving vehicles while under the influence and repeatedly getting into accidents with those vehicles. Clearly his arrest in this case did not have a deterrent effect on his criminal conduct, as the defendant repeatedly violated his bail conditions by committing additional crimes and associating with other criminals. In light of all of these events, the nature and circumstances of the offenses committed and the history and characteristics of the defendant counsel in favor of a sentence at the top of the guideline range.

---

[38] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

B.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense. Of the Boeing defendants charged with misdemeanors, this defendant is one of the few that has so obviously not been deterred from continued criminal conduct while on pretrial release. The government respectfully submits that to sentence this defendant to anything other than the top of the sentencing guideline range would not reflect the seriousness of his offenses, would undercut respect for the law by those with whom he worked and as to whose work he inspected while abusing drugs, and would not provide a just punishment for his offenses.

C.  **The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

When passing the Sentencing Reform Act, Congress explained:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[39] The investigation here took a large amount of government resources and, because of the nature of the plant under investigation and the closed culture of its employees, took many years. The

---

[39] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense. The general deterrent effect of a prison sentence is an appropriate consideration in choosing a reasonable sentence. As the courts of appeals have held both before and after Booker, deterrence under Section 3553(a) is not limited to deterrence of the particular defendant. See, e.g., United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of "the general deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation"). In this case, it is clear that there is also a specific need to protect the public from further crimes of the defendant, for at least as long as he remains incarcerated. Accordingly, a sentence at the top of the sentencing guidelines would help accomplish both the general and specific deterrence goals of the Sentencing Guidelines.

> **D.** **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

In this case, in light of the defendant's great need for substance abuse and mental health treatment, the government requests that the Court "provide the defendant with needed . . . medical care," or other care, and incorporate such care into a sentence of imprisonment and supervised release. Section 3553(a)(2)(D).

E.  **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines. Here, the defendant's conduct warrants a guideline sentence and, the government submits, a sentence at the top of the guideline range.

F.  **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

G.  **The Need to Provide Restitution to Any Victims of the Offense**

Restitution is not an issue in this case.

IV. **CONCLUSION**

For all of the reasons stated above, the government respectfully recommends a sentence at the top of the sentencing guidelines range of four to 10 months imprisonment. This

sentence is necessary to address the serious nature of the offense and the defendant's undeterred criminal conduct.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

_____/s/_____
FAITHE MOORE TAYLOR
ASHLEY K. LUNKENHEIMER
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM has been filed electronically on the Electronic Case Filing d system and is available for viewing and downloading from the ECF system, and/or was served by electronic mail on the following defense counsel:

David Laigaie, Esq.
Counsel for Michael Homer

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date: October 25, 2012